**UNITED STATES OF AMERICA**
        **Plaintiff,**

      v.                                  **Case No. 07-CR-215**

**NICHOLAS LEWANDOWSKI**
        **Defendant.**

### SENTENCING MEMORANDUM

Defendant Nicholas Lewandowski, acting as a middle-man for his friend Derek Seib, an experienced drug dealer, participated in several sales of ecstasy tablets to an undercover police officer. Charged with conspiracy to distribute controlled substances, see 21 U.S.C. §§ 841(a)(1) & (b)(1)(C) and 846, defendant pleaded guilty, and I set the case for sentencing. In imposing sentence, I first calculate the advisory sentencing guideline range, then determine the actual sentence by applying all of the factors set forth in 18 U.S.C. § 3553(a) to the facts and circumstances of the case. See, e.g., United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008); United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007).

Defendant's offense involved a total of 683 ecstasy pills, which converted to 85 kg of marijuana, producing a base offense level of 24 under U.S.S.G. § 2D1.1(c)(8) & cmt. n.10 & 11. Following a 3 level reduction for acceptance of responsibility, § 3E1.1., and coupled with his criminal history category of III, the guidelines recommended 46-57 months imprisonment.

Defendant requested a non-guideline sentence of probation based upon his lesser role in the offense, the impact of his mental health conditions on his conduct, and his efforts to turn his life around. In support of his request, he submitted his own sentencing investigation report

and an evaluation from psychologist R. Bronson Levin. Uncertain that a probationary sentence would suffice or that defendant's progress was genuine, I adjourned the case for six months to afford defendant a chance to prove himself. I was particularly interested in seeing whether defendant could maintain steady employment.

Defendant made the most of the opportunity, impressing even the experienced prosecutor with his sincerity. I therefore imposed a sentence of five years probation with a condition of six months home confinement. This sentence varied significantly from the guidelines, but for the reasons set forth in this memorandum, it was nevertheless fully justified under § 3553(a).

## I. SENTENCING FACTORS

Section 3553(a) directs the sentencing court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

2

> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

After considering these factors, the court must impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing set forth in § 3553(a)(2). The district court must give respectful consideration to the guidelines in determining a sufficient sentence, Gall v. United States, 128 S. Ct. 586, 594 (2007), but it may not presume that the guideline sentence is the correct one, Rita v. United States, 127 S. Ct. 2456, 2465 (2007). The guidelines "are but one factor among those listed in 18 U.S.C. § 3553(a)," United States v. Carter, 530 F.3d 565, 578 (7th Cir. 2008), and § 3553(a)(3) requires the court to consider non-custodial sentences even when the guidelines recommend prison, see Gall, 128 S. Ct. at 602.

## II. DISCUSSION

### A. Nature of the Offense

On May 4, 2007, defendant sold an undercover officer 19 ecstasy tablets for $320. The officer made additional purchases from defendant on May 10 (100 pills for $1400), May 17 (194 tablets for $2300), June 2 (200 tablets for $2000) and June 10 (170 tablets for $2000). Defendant said that his source was "Derek," and officers confirmed through surveillance that the supplier was Derek Seib, long a person of interest to law enforcement in the area. Officers arrested Seib on June 15, and he then provided information on another co-conspirator and his ecstasy suppliers.

### B. History and Characteristics of the Defendant

Defendant was twenty-four years old, with a modest record including convictions for

3

possession of drug paraphernalia, drunk driving, obstructing and marijuana possession. These convictions all stemmed from substance abuse issues; he had no prior record for violence, theft or drug distribution. The instant offense represented his first felony, and prior to its commission he had never served time in jail.[1]

Defendant enjoyed a pleasant childhood, with married parents who both worked; defendant lived with his parents most of his life. He graduated high school, but his employment record until recently was pretty spotty, with mostly short-term jobs. However, he took advantage of the opportunity I gave him in continuing this case for six months. He got a job at Cedar Crest Ice Cream in April 2008, and his employer described him as hard working and honest, and an asset to the warehouse team. His supervisor stated he was one of their better employees and worked hard with no complaints. At the continued sentencing hearing, defendant spoke about his job with pride, indicating that he had risen to a position of some responsibility. I also received letters from defendant's brother Christopher and his aunt and uncle, describing the changes he made over the past few months, working and attending Alcoholics Anonymous ("AA") meetings.

Defendant reported a long history of substance abuse, including alcohol and marijuana, some cocaine. However, all of his screens on pre-trial release were negative, and he complied with the other conditions of bond. He maintained sobriety since June 2007 (shortly after his arrest for drunk driving) and participated in AA since January 2008. His parents stated that they had seen a change in him since he had been sober. I found that he would benefit from

---

[1]During the period of the continuance defendant served 55 days jail with work release for a drunk driving offense he committed in May 2007, before this case was charged. He completed that sentence without incident, earning early release via good time.

4

further treatment and testing, though, which I provided in this sentence.

**C.      Guidelines and Statutory Purposes of Sentencing**

As noted, the guidelines recommended 46-57 months in prison. Under all of the circumstances, I found that recommendation greater than necessary to satisfy the purposes of sentencing. I reviewed the reports originally submitted by the defense, and although they provided support for a below-guideline sentence, at the time of the original sentencing I had doubts that straight probation would suffice. I therefore provided a continuance to see if defendant could sustain and improve upon his progress, such that a sentence served in the community would fully satisfy the purposes of sentencing, particularly the needs of the public. For the reasons set forth herein, defendant earned a chance on probation.

The original defense report indicated, with support from Dr. Levin's psychological evaluation, that defendant suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), language learning disability and passive-dependant personality disorder, which in combination with his alcohol dependence made him prone to being used and thus more susceptible to involvement in criminal conduct. Defendant knew Seib as a friend of his older brother, they met at a bar and started spending time together, and Seib suggested that defendant could make some easy money selling drugs. Defendant was at the time unemployed and trying to keep his own apartment, which happened to be above a bar, not a good location given his alcoholism. Living on his own for the first time and not wanting to ask his parents for money, he accepted Seib's invitation.

As indicated above, defendant had no history of drug distribution, but Seib had been a long-time target of law enforcement as a significant dealer. See United States v. Seib, 555 F. Supp. 2d 981, 986 (E.D. Wis. 2008) (discussing Seib's record). Dr. Levin indicated that

5

defendant was "the lesser of the two in terms of knowledge of drugs, ability to negotiate, profit from drug sales or comprehension of the risks." (Levin Report at 5.) Given Seib's prior record of drug-related activity, that seemed correct. Dr. Levin further stated, based on his evaluation and testing, that defendant "does not have the thinking ability, negotiation skills or creativity to know how to deal drugs on his own. He is dependent on others to guide his thinking. He was following directions. His alcoholism was out of control and his insight into his problems was poor." (Levin Report at 5.)

The original defense report indicated that defendant treated for his ADHD while in school, but he stopped medication after graduation, and it was then that his contacts with law enforcement began, culminating in his involvement with this conspiracy. Dr. Levin wrote, "Without the medication, his brain stopped working efficiently, leading to loss of confidence in his abilities." (Levin Report at 2.) Defendant's conduct in school while medicated revealed that he could succeed. He did well in a work study program at Poweramp, a manufacturer of material handling equipment. His supervisor at that job remembered defendant years later, indicating that he had good attendance and performed his work well. It appeared that defendant returned to those strong work habits over the last few months after re-starting his medication.

Dr. Levin's testing revealed that although defendant scored quite well on visual tasks, his verbal scores were barely above the retarded level, and his academic achievement scores were also borderline retarded. Dr. Levin opined that defendant's "true thinking ability is like that of an elementary school student," that he is "easily manipulated," and that he "learned that he had to rely on others to think for him and explain to him what he should attend to." (Levin Report at 2, 3.) Testing on the Personality Assessment Inventory supported these comments.

6

Dr. Levin further stated that, based on these traits, defendant "does not take advantage of others or think with a criminal mentality." (Levin Report at 3.) Dr. Levin concluded:

> Nick Lewandowski is a pleasant young man with cognitive and emotional limitations. His personality is kind, warm, and accommodating. There is an absence of personality traits usually associated with criminality. He is not aggressive, he does not take advantage of others, and he does not feel entitled. He engaged in brief, five-week drug distribution, being a middle-man between a more experienced drug enabler and a girl asking for ecstasy. . . . His attempt to make money to support himself grew from a misguided attempt to prove that he was financially independent from his parents. Given his disabilities, he needed instead to realize that he will be medication-dependent for life and will have to rely on others to guide his thinking. . . . He appears to be correctly interpreting the messages of AA and utilizing them well. . . . He has a decent conscience which is strong when it is not polluted by alcohol. His prognosis for avoidance of further criminal conduct is very good.

(Levin Report at 5-6.)

I accepted that defendant's mental conditions, along with his financial problems, made him susceptible to Seib's influence, and that he was unlikely to engage in this type of conduct on his own. The law enforcement surveillance, which revealed that defendant typically visited Seib right before or right after a transaction, provided support for this position. Further, defendant's course of conduct lasted less than two months and consisted of five transactions between defendant – basically acting as a middle-man for a more experienced dealer – and a single customer who asked him for ecstasy. I also noted the absence of any violence, weapon possession or threats, and that all of the sales were to a single undercover officer. Thus, none of the drugs found their way into the community. Based on the nature of defendant's specific conduct, which was instigated and apparently directed by Seib, I found a sentence below the range sufficient to provide just punishment. See 18 U.S.C. § 3553(a)(2)(A).

I also saw no need for prison to protect the public. See 18 U.S.C. § 3553(a)(2)(C).

Defendant's prior record was characteristic of a substance abuser; he had no history of violence, and this was his first felony. As Dr. Levin noted, "There is an absence of personality traits usually associated with criminality." Further, defendant had addressed those matters that rendered him susceptible to suggestion by others, maintaining sobriety since June 2007, attending AA since January 2008, and re-starting on his ADHD medication, Adderall, in March 2008. Sober and compliant with his medication regimen, I was confident that defendant would make better choices in the future.

I also gave significant weight to defendant's conduct during the six-month continuance, which also demonstrated that he posed no threat to the public. In addition to his work at Cedar Crest, participation in AA, and compliance with medication and all of his conditions of pre-trial release, defendant also took steps to improve his relationship with his family, as discussed in the letters from his brother, Christopher, and aunt and uncle. Defendant's brother wrote that he had cut off all communication with defendant prior to his arrest and considered him a lost cause. However, over the past year, Christopher indicated, defendant had gained insight into his problems, improved his organizational skills, and set goals for himself. His aunt and uncle similarly indicated that after initially suspecting that defendant was just "going through the motions" after his arrest, he was able to redeem himself in their eyes during the continuance.

In addition to restoring family trust, defendant also worked on the family home physically, remodeling their house, in addition to doing work for his neighbors. He was in the process of paying off past debts and also volunteered with the Richfield youth soccer league. He seemed particularly committed to his job, working overtime in the freezer. Because he lost his driver's license due to his traffic infractions, he typically took a cab to work, with his mother picking him

8

up, which showed a degree of dedication.[2]

Under all of these circumstances, I found that a sentence served in the community would satisfy the purposes of sentencing. I imposed the maximum term of probation to ensure that defendant stayed on the right path and attended to his treatment needs. I also imposed a period of six months home confinement to provide a sufficient measure of punishment. Because he lacked the means I required no fine, but I did order defendant to instead perform community service.

I warned defendant that any violation of his conditions of probation could lead to revocation and imposition of a prison sentence of up to 20 years. See 18 U.S.C. § 3565(a)(2) (providing that on revocation of probation, the court re-sentences the defendant under § 3553). Given his strong performance over the past year, I found this prospect (rather than a prison sentence up front) sufficient to deter defendant from re-offending. See 18 U.S.C. § 3553(a)(2)(B). Finally, because he had successfully addressed his treatment needs in the community over the past year, I found that a probationary sentence best served the purposes of sentencing identified in § 3553(a)(2)(D). This sentence varied from the guidelines, but because it was well-supported by the particular facts of the case discussed herein, it created no unwarranted disparity. See 18 U.S.C. § 3553(a)(6); see also United States v. McGee, 479 F. Supp. 2d 910, 913 (E.D. Wis. 2007) (explaining that a disparity is unwarranted "only if the judge fails to provide sufficient reasons for the difference, grounded in the § 3553(a) factors").

---

[2] A week before the adjourned sentencing date, defendant obtained an occupational driver's license, demonstrating further progress in straightening out his life.

9

## III. CONCLUSION

Therefore, I placed defendant on probation for a period of five years. As conditions, I ordered him to serve six months of home confinement, participate in drug testing and treatment, and, in lieu of a fine, perform twenty hours of community service work per year. I further ordered him to re-pay the buy money of $8020 expended by law enforcement in this investigation, joint and several with Derek Seib. I also imposed several non-standard financial conditions designed to ensure that defendant lived within his means and fulfilled his obligations. Finally, I ordered him to participate in a mental health treatment program and take any prescribed medications in order to ensure that the mental conditions that rendered him susceptible to Seib's influence did not recur. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge